Delbert D. Miller, WSBA #1154
Heidi S. Bateman, WSBA #19880
MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, WA 98101
Telephone: (206) 903-0300
Fax: (206) 903-8079
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BEA SYSTEMS, INC., a Delaware corporation | C05-1212 MJP |
| Plaintiff, | NO. |
| v. | COMPLAINT |
| THOMAS (a/k/a TOD) NIELSEN, | |
| Defendant. | 05-CV-01212-CMP |

Plaintiff alleges:

### Nature of Case

1.  Plaintiff, BEA Systems, Inc., brings this action to enforce non-competition and confidentiality agreements entered into by defendant, Thomas Nielsen, a selling shareholder and CEO of a company acquired by plaintiff, and a former executive officer of plaintiff. Defendant has become an employee of Oracle Corporation, a major competitor of plaintiff, and is otherwise engaging in activities in violation of his agreements with plaintiff.

Complaint - 1

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

## JURISDICTION AND VENUE

2. The matter in controversy in this case exceeds the sum of $75,000 and the case is between citizens of different states, which provides this Court with original jurisdiction pursuant to 28 U.S.C. §1332.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) in that the defendant is subject to personal jurisdiction in this district and the defendant contractually agreed that "any action to enforce or interpret the terms of [his agreements with BEA] shall be filed in the U.S. District Court for the Western District of Washington".

### Parties

4. Plaintiff, BEA Systems, Inc. (hereafter, ("BEA"), is a publicly traded Delaware corporation whose principal place of business is in California. BEA has paid all license fees and taxes due to the state of Washington.

### Business of BEA

5. BEA is a leading application infrastructure software provider. Its products have been adopted in a wide variety of industries, including telecommunications, commercial and investment banking, securities trading, government, manufacturing, retail, airlines, pharmaceuticals, package delivery, and insurance. BEA products serve as a platform, integration tool or portal framework for applications such as billing, provisioning, customer service, electronic funds transfers, ATM networks, securities trading and settlement, online banking, Internet sales, inventory management, supply chain management, enterprise resource planning, scheduling, logistics, and hotel, airline and car rental reservations. BEA employs more than 3,200 people, is headquartered in San Jose, California, and has 75 offices in 34 countries.

Complaint - 2

## Competitive Nature of Business

6. The market for application server and integration software, and related software infrastructure products and services, is highly competitive. BEA competitors are diverse and offer a variety of solutions directed at various segments of this marketplace. These competitors include IBM, which also offers operating system software and hardware as discussed below, and Oracle, which can bundle its competing product with their database and other software offerings at a discounted price. In addition, certain application vendors, enterprise application integration vendors and other companies are developing or offering application server, enterprise application integration and portal software products and related services that may compete with products that we offer. Further, software development tool vendors typically emphasize the broad versatility of their tool sets and, in some cases, offer complementary software that supports these tools and performs basic application server and integration functions. These tool vendors offer products that may compete with some of the features of BEA's own product offerings. Finally, internal development groups within prospective customer organizations may develop software and hardware systems that may substitute for those we offer. A number of BEA competitors and potential competitors have longer operating histories, substantially greater financial, technical, marketing and other resources, greater name recognition and a larger installed base of customers than BEA has. The market served by BEA is relatively new, constantly changing and intensely and increasingly competitive.

7. Defendant Thomas (a/k/a Tod) Nielsen ("Nielsen") is an individual who resides in King County in the Western District of Washington.

8. Nielsen was formerly an executive with Microsoft Corporation. After serving as a principal witness in the Microsoft anti-trust litigation with the Justice Department, he became a principal

Complaint - 3

shareholder and Chief Executive Officer of Crossgain Corporation until he sold that company to plaintiff, BEA.

### Nielsen's Employment and Contracts with BEA

9. In 2001, BEA acquired the business of Crossgain Corporation ("Crossgain") pursuant to an Agreement and Plan of Merger by and between Crossgain, BEA and B-1 Acquisition Corporation dated July 6, 2001. BEA and Nielsen agreed that the only method of preserving and protecting the assets thereby acquired by BEA from Nielsen and other shareholders of Crossgain was by restricting the ability of Nielsen to engage in certain competitive business activities.

10. BEA and Nielsen entered into a written Employment Agreement on July 6, 2001 ("the Employment Agreement"). Pursuant to the Employment Agreement, Nielsen was hired as the Senior Vice President, Developer Programs at BEA. BEA and Nielsen at the same time also entered into a written Employee Proprietary Information and Inventions Agreement ("Proprietary Information Agreement") which was included as Exhibit A to the Employment Agreement.

11. Under the terms of the Employment Agreement, Nielsen agreed, among other things, that he would not engage in certain competitive business activities for a period of one year following the termination of his employment by BEA. The non-compete provision in the Employment Agreement is set forth in paragraph 1(e) and provides as follows:

> (e) Noncompetition and nonsolicitation. Employee acknowledges that as a result of the Company's acquisition of the business of Crossgain Corporation ("Crossgain") the only method of preserving and protecting the assets acquired by the Company is by restricting the ability of Employee to engage in certain competitive business activities in the manner set forth in this Section 1(e). Accordingly, for a period of two (2) years following the Effective Date of this Agreement, or a period of one (1) year following the termination of Employee's employment hereunder for any reason, whichever ends later, Employee agrees that he will not, either directly or indirectly:

Complaint - 4

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

(1) Engage in (whether as an employee, consultant, proprietor, partner, director or otherwise) or have any ownership interest in, or participate in the financing operation, management, control of, any person, firm, corporation or business that engages in any business activity that is competitive with the Company (or any wholly or majority owned subsidiary of the Company), provided however, .. [proviso allowing ownership of up to 1% of a publicly traded company omitted];

(2) Divert or attempt to divert from the Company (or any parent company of the Company or any wholly or majority owned subsidiary of the Company) any business of any kind in which it is engaged, including without limitation, the solicitation of or interference with any of its suppliers or customers; or

(3) Solicit, hire, recruit, or employ any person or entity who is employed by or has a contractual relationship with the Company, or encourage any person or entity who is employed by or has a contractual relationship with the Company to terminate their employment or contractual relationship with the Company.

12. Pursuant to the Proprietary Information Agreement, Nielsen further agreed to "hold in strict confidence and in trust for the sole benefit of the Company" certain Proprietary Information, as defined in the Proprietary Information Agreement throughout the term of his employment and for a period of one year thereafter.

13. Nielsen, as Executive Vice President, Chief Marketing Officer of BEA Systems, was a member of the President and CEO's executive staff and participated in every aspect of the Company's business plans, strategies and implementations. He was responsible for all of BEA's marketing and product strategies and competitive positioning and formulated all of the Company's most sensitive and critical strategies in competing with Oracle, and IBM in the middleware software market which includes, but is not limited to, web application server software, portal software, integration software where BEA's products compete directly with Oracle's products.

Complaint - 5

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

14. In his position, Nielsen had access to all of BEA's customer lists and information, product information including plans, strategies, strengths and weaknesses, key employee and executive information, and marketing programs, plans and strategies.

15. During the course of his employment at BEA, Nielsen was granted stock options and was given significant promotions and advancement, both in responsibility and in compensation.

16. The confidential information obtained by Nielsen from BEA are trade secrets within the meaning of the Washington Uniform Trade Secrets Act, RCW 19.108.010 *et seq.*

### Termination of Nielsen's Employment and the Separation Agreement

17. Nielsen's employment with BEA terminated August 16, 2004, on which date BEA and Nielsen entered into a written Separation Agreement and General Release of Claims ("Separation Agreement").

18. Pursuant to the Separation Agreement, BEA agreed to and did pay Nielsen $375,000, equal to one year's pay, to compensate him for his agreement not to become employed by a competitor for a period of one year.

19. As a part of Nielsen's separation agreement, BEA accelerated 5,866 shares of his Crossgain stock option upon his termination August 26, 2004. These 5,866 shares would have normally vested on 12/5/2004. On October 28, 2004 Nielsen exercised his option in its entirety. His stock option price was $6.27 and he executed a same-day-sale at a sale price of $8.1552. The acceleration of the 5,866 shares added $11,058.58 to his total gain on the exercise of these shares. BEA had a compensation expense on the date of the acceleration of $4,164.86.

20. Paragraph 3 of the Separation agreement provides:

Complaint - 6

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

> 3. In exchange for the promises set forth herein, BEA will pay you a severance payment equal to $375,000, less applicable withholdings, which is equal to 12 months' pay at your current base salary (the "Severance Payment"). This Severance Payment will be paid to you in a lump sum within ten (10) days of the date that you sign and return this Agreement to BEA. BEA also will accelerate the vesting of the unvested BEA stock options to purchase 5,866 shares of BEA common stock that were granted to you on July 19, 2000 in connection with BEA's acquisition of CrossGain such that those stock options shall be immediately exercisable as of your Separation Date. You understand and agree that your receipt of the severance benefits described in this paragraph 3 is contingent upon your signing and returning this Agreement to BEA, and your continued adherence to the covenants set forth below.

21.  Nielsen signed and returned the Separation Agreement to BEA on August 16, 2004.

22.  In the Separation Agreement, in exchange for the payment of one year's salary in advance and other consideration, Nielsen specifically reaffirmed the post-termination obligations of the Employment Agreement. Paragraph 8 of the Separation Agreement provides as follows:

> 8. By signing this Agreement, you affirm that the post-termination restrictions set forth in paragraph 1(e) of your Employment Agreement with BEA dated July 6, 2001 are valid and enforceable as they pertain to your post-termination activities following the Separation Date, and that those restrictions shall remain in effect for a period of one year following your Separation Date. You further acknowledge that the restrictions in paragraph 1(e) of your Employment Agreement are reasonable and necessary to protect BEA's legitimate business interests following the Separation Date, and agree, represent, and warrant that you shall adhere to those restrictions for a period of one year following your Separation Date. More specifically, you agree that for a period of one (1) year following the Separation Date specified above, you will not, directly or indirectly:
>
> > a. Engage in (whether as an employee, consultant, proprietor, partner, director or otherwise) or have any ownership interest in, or participate in the financing operation, management, control of, any person, firm, corporation or business that engages in any business activity that is competitive with the Company (or of any Affiliated Company (as defined in your Employment Agreement)), provided, however, that nothing contained in this paragraph 8(a) shall be construed to prohibit you from purchasing and owning (directly or indirectly) up to one percent (1%) of the capital stock or other securities of any corporation or other entity whose stock or securities are traded on any national or regional securities exchange or the national over-the-counter market and such ownership shall not constitute a violation of this paragraph 8(a).
>
> > b. Divert or attempt to divert from the Company (or any Affiliated Company (as defined in your Employment Agreement)) any business of any kind in which it is engaged,

Complaint - 7

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

including, without limitation, the solicitation of or interference with any of its suppliers or customers,

c. Solicit, hire, employ, or recruit any person or entity who is employed by or has a contractual relationship with the Company, or encourage any person or entity who is employed by or has a contractual relationship with the Company to terminate their employment or contractual relationship with the Company.

23. In the Separation Agreement, Nielsen agreed to refrain from making disparaging or defamatory comments regarding BEA. Paragraph 10 of the Separation Agreement provides:

> 10. You also agree to refrain from making disparaging or defamatory comments regarding the Company, its products, or any other Released Party. You further agree that you will not publish or make any statements to any third party (including but not limited to any members of the press and/or any prospective or subsequent employer) about (a) the reasons for and circumstances surrounding your departure from BEA, or (b) your views regarding BEA's past, present and future business plans or operations, except to state that you have resigned from the Company to pursue other interests. BEA agrees that it will instruct its CEO and the other members of its Executive Leadership Team not to make disparaging or defamatory comments about you, and will take reasonable measures to ensure that its CEO and Executive Leadership Team do not make any such comments about you. In response to any inquiries about your employment with BEA, BEA will provide your title and dates of employment, and will state that you resigned from the Company to pursue other interests.

24. In the Separation Agreement, Nielsen agreed that the covenants in the Separation Agreement and in his Employment Agreement were reasonable and necessary and that injunctive relief was appropriate, without bond, in the event of their breach by Nielsen. Paragraph 12 of the Separation Agreement provides:

> You understand and agree that the provisions of paragraphs 7-8 of this Agreement, Section 1(e) of your Employment Agreement, and the provisions of your Proprietary Information and Invention Assignment Agreement in its entirety are reasonable and necessary in order to protect the legitimate interests of the Company. You further acknowledge that any breach or threatened breach of those provisions would result in irreparable harm to the Company, and that the remedy at law for any breach or threatened breach of those provisions is and will be inadequate. Therefore, you acknowledge and agree that in the event of a breach or threatened breach of paragraphs 7-8 of this Agreement, Section 1(e) of your Employment Agreement and/or any provisision [sic] of your Proprietary Information and Invention Assignment Agreement, the Company shall be entitled to equitable remedies without the obligation to post bond or other

Complaint - 8

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

security in seeking such relief, including, but not limited to, specific performance or temporary, preliminary or permanent injunctive relief restraining you from violating said provisions. Nothing contained in this Agreement shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including, without limitation, the recovery of damages from you.

### Nielsen's Breaches of Contract

25.　Nielsen became employed by Oracle Corporation prior to the expiration of one year from the date of termination of his employment with BEA.

26.　Oracle is a direct competitor of BEA.

27.　Upon information and belief, Oracle solicited and hired Nielsen with knowledge of the fact that he was a former BEA employee subject to non-compete and non-disclosure agreements and with knowledge of such agreements.

28.　By letter dated June 22, 2005, BEA put Nielsen on notice of the terms of the Agreements and made demand upon him that he comply with the terms of the Agreements.

29.　Nielsen has failed and refused to terminate his unlawful employment relationship and is continuing to engage in competitive activity.

30.　Nielsen and Oracle are represented by the same attorney and they have stated, through their joint attorney that Nielsen has no intention of honoring the terms of his Agreements with BEA not to work for a competitor.

31.　Oracle has publicly announced that Nielsen will be the Oracle executive responsible for directing and running Oracle's middleware software business which includes Oracle's web application server software, portal software, and integration software products that compete directly with BEA's products. At their earnings conference call on July 1, 2005, Oracle executives announced that Nielsen will run middleware project management for Oracle. In the same conference call, Oracle stated, among

Complaint - 9

other things, that BEA "was in decline". Upon information and belief, Nielsen has made similarly disparaging remarks about BEA to Oracle, which remarks have been publicly repeated by Oracle.

32. The severance benefits described in paragraph 3 of the Separation Agreement were paid and received by Nielsen contingent upon his continued adherence to the covenants set forth in the Separation Agreement. Nielsen, by taking employment with Oracle when he did has failed to adhere to the covenants set forth in the Separation Agreement.

33. Nielsen is liable to BEA for return of the $375,000 severance payment that he received from BEA less than one year ago and for the value of all other severance benefits received, the exact amount of which will be proved at trial.

### Impact on BEA

34. Nielsen's employment by Oracle in breach of Nielsen's Agreements jeopardize BEA's legitimate interest in protecting its trade secrets, marketing plans, strategies, business plans and other confidential information as defined in the Agreements.

35. Nielsen's breach of contract and employment by Oracle will result in the inevitable use and disclosure of trade secrets and other confidential information in violation of the Agreements and in violation of law.

36. Nielsen's breach of contract and employment by Oracle will provide to Oracle unfair competitive advantage over BEA and constitutes unfair competition by Oracle.

37. Nielsen's breach of contract and employment by Oracle will cause irreparable harm to BEA for which BEA will have no adequate remedy at law.

38. Nielsen's breach of contract has or may, if not enjoined, cause monetary damages to BEA, the exact amount of which is not presently known, but which will be proved at trial.

Complaint - 10

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

## Oracle's Competition with BEA

39. Oracle has stated its intent to utilize the services and knowledge of Nielsen in the conduct of its business. Oracle's proposed business activity is directly competitive with BEA in the following ways: Oracle's Application Server 10g competes directly with BEA's primary products, BEA WebLogic Platform and BEA WebLogic Server, as evidenced by numerous analyses on Oracle's own web site such as "How migrating your WebLogic applications to Oracle can save you money: BEA Switch & Save White Paper" and "Customers tell why they chose Oracle Application Server over BEA WebLogic."

40. Oracle has used very competitive tactics against BEA's products. The Oracle "Switch and Save" program has been extensively advertised and used by Oracle for the past year or so in which Oracle states that it will replace any customer's BEA Software products with Oracle's Software products at no cost to the customer. Oracle has publicized this program world wide. It indicates that Oracle has specifically targeted BEA as their main competition in the middleware software market, which Nielsen had been hired to lead.

## Prayer for Relief

Wherefore, plaintiff prays for relief as follows:

A. For a temporary restraining order, a preliminary injunction *pendente lite*, and a final permanent injunction to remain in effect for a period of one year from August 16, 2004 that:

    1. Restrains and enjoins Nielsen from directly or indirectly being employed by, owning, managing, consulting with, or joining in any business with Oracle or any other competitor of BEA;

Complaint - 11

MILLER BATEMAN LLP
1426 Alaskan Way, Suite 301
Seattle, Washington 98101-2016
Telephone: (206) 903-0300
Fax: (206) 903-8079

2. Restrains and enjoins Nielsen from disclosing any information in violation of the confidentiality provisions of the Agreements.

B. For a declaration that the Agreements between Nielsen and BEA are fully enforceable;

C. For an order requiring Nielsen to return the $375,000 severance payment and the value of all other severance benefits received;

D. For damages in an amount to be proved at trial;

E. For an award of its attorneys fees, costs and disbursements;

F. For such other and further relief, legal or equitable, as is just.

DATED this 7th day of July, 2005.

MILLER BATEMAN LLP

*/s/ Delbert Miller*

Delbert D. Miller, WSBA # 1154
Heidi S. Bateman, WSBA #19880
Attorneys for Plaintiff

Complaint - 12